**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MICHAEL LEWIS, derivatively on behalf of DICK'S SPORTING GOODS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>EDWARD W. STACK, MARK J. BARRENECHEA, EMANUEL CHIRICO, WILLIAM J. COLOMBO, ROBERT W. EDDY, ANNE FINK, LARRY FITZGERALD, JR., NAVDEEP GUPTA, LAUREN R. HOBART, SANDEEP MATHRANI, DESIREE RALLS-MORRISON and LAWRENCE J. SCHORR<br><br>Defendants,<br><br>and<br><br>DICK'S SPORTING GOODS, INC.,<br><br>Nominal Defendant. | CASE NO.<br><br>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Michael Lewis ("Plaintiff"), by and through his attorneys, hereby submits this Shareholder Derivative Complaint (the "Complaint") for the benefit of Nominal Defendant Dick's Sporting Goods, Inc. ("Dick's" or "Company"), against certain current and former members of its Board of Directors (the "Board") and executive officers seeking to remedy Defendants' breaches of fiduciary duties and unjust enrichment from September 8, 2025 through the present (the "Relevant Period"). Plaintiff makes these allegations upon personal knowledge and the investigation of counsel, which included, among other things, review and analysis of: a) public

filings made by Dick's and other related parties and non-parties with the Securities and Exchange Commission ("SEC"); b) press releases and other publications disseminated by certain of the Defendants and other non-parties; c) news articles, shareholder communications and postings on the Company's website; d) publicly available filings in a related securities class action lawsuit captioned *Plumbers & Pipefitters Local Union #295 Pension Fund v. Dick's Sporting Goods, Inc. et al.*, No. 2:26-cv-01860, in the U.S. District Court for the Western District of Pennsylvania; and e) other publicly available information concerning Dick's and the Individual Defendants (defined below under "Parties.") Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. Dick's is the largest sporting goods retail company in the United States, with over 850 locations including DICK'S Sporting Goods, Golf Galaxy, Public Lands and Going Going Gone! stores across the United States.

2. On or about September 8, 2025, Dick's completed its acquisition of athletic shoe store chain Foot Locker, Inc. ("Foot Locker"), which includes approximately 2,400 Foot Locker, Kids Foot Locker, Champs Sports, WSS and atmos locations worldwide, for $2.4 billion.

3. For the next year, Dick's touted the union, boasting how combining the two athletic wear giants would "unlock value for both companies" and "redefine the sports retail industry," while, all the while, reassuring investors that the inventory and promotional problems that had long plagued Foot Locker had been "cleaned up" and were "done."

4. In reality, Foot Locker remained encumbered by unproductive inventory and dependent on legacy footwear products and promotions to drive (unsustainable) revenue. As a result, Dick's was exposed to inventory build-ups across industry supply chains and the retail

marketplace and thus unable to achieve the financial targets it announced and promoted to investors.

5. Investors learned the Company's true financial condition on August 25, 2026, when Dick's reported disappointing second-quarter 2026 results, including revenue from Foot Locker that fell well short of Company and analyst estimates. Dick's also reduced the 2026 sales guidance the Company recently had raised, disclosing, among other things, that it expected Foot Locker's proforma comparable sales to yield a range of negative 2% to 0% for the year, a far cry from the Company's March 2026 forecast of 1% to 3% growth and May 2026 upwardly revised forecast of 1.5% to 3% growth.

6. Left with no other options, Executive Chairman of the Board Edward Stack conceded that, contrary to the Company's numerous assurances, the athletic footwear marketplace had, in fact, become "increasingly promotional" since Dick's acquired Foot Locker, which had a material negative impact on the Foot Locker business because of its "greater exposure to legacy footwear" and "dependence on footwear launch and retro product."

7. On this news, the Dick's common stock price plummeted approximately 30%, or $55.02 per share, from $179.33 per share at close on August 24 to $124.31 per share at close on August 25, 2026.

8. As alleged below, throughout the Relevant Period, the Individual Defendants made, endorsed or otherwise allowed Dick's to issue the above-referenced false and/or misleading statements in violation of their fiduciary duties. As a result, the Company has suffered significant financial and reputational damages.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

10. This Court has jurisdiction over each Defendant because they reside in this district or have sufficient minimum contacts with this district to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. The Court has personal jurisdiction over the Nominal Defendant because it is authorized to do business in this state, has consented to service in this state and its principal place of business is within this district.

11. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because one or more of the Defendants either resides, or maintains offices, in this district, a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to the Company occurred in this district, and the Individual Defendants have received substantial compensation in this district by doing business here and engaging in numerous activities that had an effect in this district.

## PARTIES

12. Plaintiff is a current shareholder of Dick's and has continuously held Dick's common stock since January 2025. Plaintiff is a citizen of Iowa.

13. Nominal Defendant Dick's is a Delaware corporation with its principal offices located in Coraopolis, PA. Dick's common stock trades on the New York Stock Exchange under the ticker symbol "DKS."

14. Defendant Edward W. Stack ("Stack") is the son of founder Richard "Dick" Stack and has served as the Company's Board Chairman since 1984. Upon information and belief, Stack is a resident of Pennsylvania.

15. Defendant Mark J. Barrenechea ("Barrenechea") has served as a Dick's director since 2014 and is Chairman of the Board's Audit Committee. Upon information and belief, Barrenechea is a resident of California.

16. Defendant Emanuel Chirico ("Chirico") has served as a Dick's director since 2003 and is a member of the Board's Audit Committee. Upon information and belief, Chirico is a resident of New York.

17. Defendant William J. Colombo ("Colombo") has served as the Board's Vice-Chairman since 2008 and a director since 2002. Columbo is a member of the Board's Compensation Committee and Governance and Nominating Committee. Upon information and belief, Colombo is a resident of Pennsylvania.

18. Defendant Robert W. Eddy ("Eddy") has served as a Dick's director since 2023. Eddy is Chairman of the Board's Compensation Committee and a member of its Governance and Nominating Committee. Upon information and belief, Eddy is a resident of Massachusetts.

19. Defendant Anne Fink ("Fink") has served as a Dick's director since 2019. Fink is Chairwoman of the Board's Governance and Nominating Committee and a member of its Compensation Committee. Upon information and belief, Fink is a resident of New York.

20. Defendant Larry Fitzgerald, Jr. ("Fitzgerald") has served as a Dick's director since 2020. Fitzgerald is a member of the Board's Compensation Committee and Governance and Nominating Committee. Upon information and belief, Fitzgerald is a resident of Arizona.

21. Defendant Navdeep Gupta ("Gupta") has served as the Company's Chief Financial Officer since 2021, prior to which he served as its Chief Accounting Officer from 2017 to 2021. Upon information and belief, Gupta is a resident of Pennsylvania.

22. Defendant Lauren R. Hobart ("Hobart") has served as the Company's President and Chief Executive Officer ("CEO") since 2021 and a director since 2018. Upon information and belief, Hobart is a resident of Pennsylvania.

23. Defendant Sandeep Mathrani ("Mathrani") has served as a Dick's director since 2020. Mathrani is a member of the Board's Audit Committee. Upon information and belief, Mathrani is a resident of Florida.

24. Defendant Desiree Ralls-Morrison ("Ralls-Morrison") has served as a Dick's director since 2020. Ralls-Morrison is a member of the Board's Audit Committee. Upon information and belief, Ralls-Morrison is a resident of Illinois.

25. Defendant Lawrence J. Schorr ("Schorr") has served as a Dick's director since 1985 and as Lead Director since 2012. Schorr is a member of the Board's Compensation Committee and Governance and Nominating Committee. Upon information and belief, Schorr is a resident of Florida.

26. Defendants Stack, Barrenechea, Chirico, Colombo, Eddy, Fink, Fitzgerald, Gupta, Hobart, Mathrani, Ralls-Morrison and Schorr are referred to herein as the "Individual Defendants."

27. Defendants Stack, Barrenechea, Chirico, Colombo, Eddy, Fink, Fitzgerald, Hobart, Mathrani, Ralls-Morrison and Schorr are referred to herein as the "Director Defendants."

28. Defendants Barrenechea, Chirico, Mathrani and Ralls-Morrison are referred to herein as the "Audit Committee Defendants."

**INDIVIDUAL DEFENDANTS' DUTIES**

29. By reason of their positions as officers, directors, and/or fiduciaries of Dick's, and because of their ability to control the business and corporate affairs of the Company, Individual Defendants owed Dick's and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner.

30. Further, Individual Defendants were and are required to act in furtherance of the best interests of Dick's and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest and benefit. Each director and officer of the Company owes to Dick's and its shareholders the fiduciary duty to exercise good faith and due diligence in the administration of the Company's affairs, and in the use and preservation of its property and assets, as well as the highest obligation of fair dealing.

31. Because of their positions of control and authority as directors and/or officers of Dick's, having knowledge of material non-public information regarding the Company, the Individual Defendants were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties the Individual Defendants were required to, among other things:

a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner, and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public; and

c. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

32. The Board's "Corporate Governance Guidelines" states, in relevant part:

> *The following Corporate Governance Guidelines (the "Guidelines") have been adopted by the Board of Directors (the "Board") of DICK'S Sporting Goods, Inc. (the "Company") to assist the Board in the exercise of its duties and responsibilities and to serve the best interests of the Company. These Guidelines reflect the Board's commitment to monitor the effectiveness of policy and decision making both at the Board and management level, with a view to achieving strategic growth of the Company while enhancing stockholder value over the long term. These Guidelines should be interpreted in the context of all applicable laws, the Company's charter documents and other governing legal documents and the Company's policies. The Guidelines are intended to serve as a flexible framework within which the Board may conduct its business and not as a set of legally binding obligations. The Guidelines are subject to modification from time to time by the Board as the Board may deem appropriate in the best interests of the Company and its stakeholders or as required by applicable laws and regulations*. (Emphasis in original).
>
> * * *
>
> It is the duty of the Board, whether directly or through its committees, to oversee the business and affairs of the Company and management's performance to ensure that the Company operates in an effective, efficient and ethical manner in order to produce value for the Company's stockholders. The Board also evaluates the Company's overall strategy, including matters related to corporate responsibility

> and sustainability issues, and monitors its performance against its plans and against the performance of its peers. Additionally, the Board is responsible for oversight of strategic, financial and execution risks and exposures associated with the Company's business strategy, policy matters, significant litigation and regulatory matters, corporate responsibility and sustainability initiatives, and other current matters that might present material risk to the Company's financial performance, operations, infrastructure, plans, prospects or reputation, acquisitions and divestitures. The basic responsibility of a director is to exercise his or her business judgment and act in what he or she reasonably believes to be in the best interests of the Company. A director is also expected to spend the time and effort necessary to properly discharge such director's duties and responsibilities. Accordingly, each director is expected to rigorously prepare for (including the review of materials received in advance of meetings), attend, and participate in all Board and applicable committee meetings, and keep current with issues and policy decisions facing global businesses. A director who is unable to attend a meeting is expected to notify the Executive Chair or the chair of the appropriate committee in advance of such meeting. Each director is expected to attend the Company's annual meeting of stockholders.

33. Additionally, certain of the Director Defendants had, at all relevant times, additional duties to the Company's shareholders by virtue of their memberships on Board committees. The Charter of the Audit Committee states, in relevant part:

> Purpose and Responsibilities:
>
> The Audit Committee has been created to implement and to support the Board of Directors (the "Board") of DICK'S Sporting Goods, Inc. (the "Company") in its oversight of: quality financial reporting, accounting policies, internal controls, risk and compliance management, and independent and objective outside auditors.
>
> The Audit Committee has responsibility to:
>
> - oversee the integrity of the audit process, financial reporting and internal accounting controls of the Company;
> - oversee the work of the Company's financial management ("Management") and the internal auditors employed by the Company (the "Internal Auditors");
> - oversee the work of the independent registered public accounting firm employed by the Company for the purpose of preparing or issuing an audit report or related work (the "Outside Auditors"), and the independence and qualifications of said Outside Auditors;
> - oversee Management's development of, and adherence to, a sound system of internal accounting and financial controls;

- ensure that the Internal Auditors and the Outside Auditors objectively assess the Company's financial reporting, accounting practices and internal controls;
- provide an open avenue of communication between the Outside Auditors, the Internal Auditors and the Board;
- oversee Management's development and adherence to guidelines and procedures for risk and compliance management, including with respect to financial matters, legal and compliance matters, information technology, data protection and cybersecurity risk, and internal controls and disclosure related to corporate responsibility and sustainability matters; and
- oversee the process for the recoupment of any compensation pursuant to the Company's clawback policy in the event of an accounting restatement.

*  *  *

Oversight and Review of Accounting Principles and Practices and Internal Controls.

16. The Audit Committee will, as it deems necessary, exercise oversight of, and review and discuss with Management, the Outside Auditors and the Internal Auditors:

A. significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, the clarity of the financial disclosures made, changes in the Company's accounting principles or practices, the application of particular accounting principles and disclosure practices by Management to new transactions or events and the development, selection and disclosure of critical accounting estimates and analysis of alternative assumptions or estimates and the effect of such estimates on the Company's financial statements;

B. potential major changes in generally accepted accounting principles and the effect of those changes on the Company's financial statements;

C. changes in accounting principles, financial reporting policies and internal controls proposed to be implemented by the Company;

D. significant litigation, contingencies and claims against the Company and material accounting issues that require disclosure in the Company's financial statements;

E. information regarding any "second" opinions sought by Management from an independent auditor with respect to the accounting treatment of a particular event or transaction;

F. Management's compliance with the Company's processes, procedures and internal controls;

G. the adequacy and effectiveness of the Company's internal accounting and financial controls and the recommendations of Management, the Outside Auditors and Internal Auditors for the improvement of accounting practices and internal controls; and

H. disagreements between Management and the Outside Auditors or the Internal Auditors regarding the application of any accounting principles or any other matter and the Audit Committee shall resolve any such disagreements.

Oversight and Monitoring of the Company's Financial Statements and Audits.

17. The Audit Committee will review and discuss the annual audited financial statements (prior to the filing of its Form 10-K) and quarterly financial statements (prior to the filing of its Form 10-Q) with Management, the Internal Auditors and the Outside Auditors, including reviewing the Company's specific disclosures under management's discussion and analysis in those reports. The Audit Committee will recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

18. The Audit Committee will:

A. review and discuss with Management, and to the extent the Audit Committee deems necessary or appropriate, the Internal Auditors and the Outside Auditors, the Company's disclosure controls and procedures that are designed to ensure that the reports the Company files with the Commission comply with the Commission's rules and forms.

* * *

Oversight of Risk and Compliance.

27. The Audit Committee shall review and assess the Company's business and financial risk management process, including the adequacy of the overall control environment and controls in selected areas representing significant risk.

28. As required by NYSE rules, the Audit Committee will review and discuss at least annually with Management, the Company's material risk exposures including, but not limited to, risks related to finance, operations,

> information technology, data privacy, cybersecurity, corporate responsibility and sustainability, legal and regulation.
>
> 29. The Audit Committee shall periodically review the efficacy of the Company's risk assessment and risk management practices and programs, including review of the Company's cyber incident recovery measures and preparedness with appropriate professionals, including but not limited to the Chief Information Security Officer, external auditors, and internal auditors.
>
> 30. The Audit Committee shall review and assess the Company's system of internal controls for detecting accounting and financial reporting errors, fraud, legal violations, and noncompliance with the Code of Ethics and Business Conduct, and oversee Management's review, at least annually, of the Company's key guidelines and policies governing the Company's ethical corporate culture and other risk prevention, compliance and assurance programs.
>
> 31. Periodically review legislative and regulatory developments impacting the Company's financial statements and disclosures mandated by the Commission.
>
> 32. In conjunction with the Outside Auditors, Internal Auditors, and Compensation Committee, as necessary, oversee the process for the recoupment of any compensation pursuant to the Company's clawback policy in the event of an accounting restatement.

## SUBSTANTIVE ALLEGATIONS

### A. Background

34. According to the Company's Annual Report for fiscal year ended January 31, 2026 filed March 27, 2026 with the SEC on Form 10-K ("2025 Annual Report"), Dick's is "a leading global sports retailer offering an extensive assortment of authentic, high-quality sports equipment, apparel, footwear and accessories" through approximately 850 locations including DICK'S Sporting Goods, Golf Galaxy, Public Lands and Going Going Gone! stores across the United States.

35. On September 8, 2025, Dick's acquired athletic shoe store chain Foot Locker, Inc. ("Foot Locker") which includes approximately 2,400 Foot Locker, Kids Foot Locker, Champs Sports, WSS and atmos locations worldwide, for $2.4 billion.

### B. Defendants' False and Misleading Statements

36. On September 8, 2025, Dick's filed with the SEC on Form 8-K a press release titled DICK'S Sporting Goods Completes Acquisition of Foot Locker ("8/8/25 Release"), which touted its approximately $2.4 billion acquisition. Specifically, the 8/8/25 Release stated, in relevant part:

> DICK'S . . . today announced that it has completed its acquisition of Foot Locker, Inc. ("Foot Locker"), a leading footwear and apparel retailer. ***DICK'S is now positioned to become a global leader in the sports retail industry at the intersection of sport and culture, serving a broader set of consumers across compelling, differentiated concepts***.[1]
>
> As a combined company, DICK'S will now operate more than 3,200 stores plus e-commerce and digital businesses across 20 countries in North America, Europe, Asia, and Australia, plus a licensed store presence in Europe, the Middle East and Asia. T***his expanded footprint will strengthen its relationships with key brand partners by offering broader reach and enhanced visibility on a global level***.
>
> DICK'S will continue to operate Foot Locker's portfolio of brands, including Foot Locker, Kids Foot Locker, Champs Sports, WSS, and atmos, under an experienced new leadership team. DICK'S Executive Chairman, Ed Stack, will lead the global Foot Locker businesses, in partnership with two new presidents, one for North America and one for International, to ***enable acceleration of business momentum and targeted turnaround strategies***. Ann Freeman, a longtime former Nike executive, has been appointed President of Foot Locker North America. DICK'S will appoint a President of Foot Locker International to lead other regions.
>
> * * *
>
> The ***transaction is expected to deliver between $100 million to $125 million in cost synergies in the medium term, primarily through procurement and direct sourcing efficiencies***, and DICK'S anticipates the transaction to be accretive to EPS in Fiscal Year 2026 (excluding transaction and other one-time costs to achieve synergies).
>
> * * *

[1] All emphasis added unless otherwise indicated.

> "We are excited to officially welcome the Foot Locker team," added Lauren Hobart, President and CEO of DICK'S. "***Bringing together the strengths of both companies will help us return Foot Locker to growth while continuing to fuel DICK'S momentum. As a combined company, DICK'S and Foot Locker will create a global platform that will redefine the sports retail industry and unlock value for both companies, our brand partners, our teammates, our communities and our shareholders***."

37. On November 25, 2025, Dick's hosted an earnings conference call with analysts and investors to discuss the Company's third quarter 2025 financial results ("11/25/25 Earnings Call"). During the 11/25/25 Earnings Call, Stack noted Foot Locker's past failure to "execute the fundamentals . . . leaving Foot Locker with the wrong inventory . . ." and stated that "***our conviction that we can turn this business around has only grown***. We will bring our ***operational excellence, our supplier relationships and our merchandise expertise*** to return Foot Locker to its rightful place as a top player in the specialty athletic channel." Expanding on this statement, Stack also stated on the 11/25/25 Earnings Call:

> Our first priority is clear. ***We need to clean out the garage of underperforming assets. This means clearing out unproductive inventory, closing underperforming stores and rightsizing assets*** that don't align with our go-forward vision for the Foot Locker business. This is the groundwork for the transformation. ***We began this work shortly after the closing on September 8***.
>
> We have ***identified an initial number of underperforming assets around the globe, including inventory that needs to be marked down and liquidated*** along with a preliminary number of stores that need to be impaired or closed. ***We initiated certain pricing actions in late Q3 and will be more aggressive in Q4 to clean up unproductive inventory. Our intent is to get the vast majority of the inventory charges behind us by the end of the year***, so we can start 2026 fresh and position Foot Locker for an inflection point during the back-to-school season in 2026.

38. On March 12, 2026, Dick's filed with the SEC on Form 8-K a press release titled DICK'S Sporting Goods, Inc. Reports Fourth Quarter and Full Year 2025 Results; Delivers Record-Setting Fourth Quarter Sales for the DICK'S Business ("3/12/26 Release"), in which Stack

represented that "***our 'clean out of the garage' efforts have set up Foot Locker to play offense*** and deliver the inflection point we expect . . ."

39. Consistent with Stack's representations, the Company forecasted "full year proforma ***comparable sales growth to be in the range of 1.0% to 3.0% for the Foot Locker Business***" ***and net sales of $22.1 billion to 22.4 billion*** in the 3/12/26 Release.

40. Also on March 12, 2026, Dick's hosted an earnings conference call with analysts and investors to discuss the Company's fourth quarter and full year 2025 financial results ("3/12/26 Earnings Call"). During the 3/12/26 Earnings Call, Stack unequivocally stated:

> As discussed last quarter, ***our first priority was to clean out the garage, starting with addressing unproductive inventory. The team moved quickly and decisively to get this done, and we're pleased to report that the inventory cleanup is now essentially complete***. That work drove the fourth quarter profitability results we told you to expect. And as part of this process, ***we also leveraged DICK'S value chain to efficiently clear product***. We're also pleased that Q4 sales came in better than expected.
>
> We believe that ***Foot Locker's inventory is now well positioned with this heavy lift behind us, we're set up to play offense*** and deliver the inflection point we expect to see in this business starting with back-to-school. . .

41. Also during the 3/12/26 Earnings Call, Stack had the following exchange with an analyst:

> [Barclays Bank PLC analyst:]
> And I'll add my congratulations. Very well done. Great way to end the year and start the new one. It sounds like there's a lot of exciting work underway at Foot Locker to reposition the business for its turn in '26. So on top of that, the Q4 results came in better than you thought, particularly sales and margins were in line. So my question centers around the cleaning out of the garage, which you expressed last quarter as your top priority. It sounds like inventory is nice and clean. How would you characterize where you are? Is there more work to do? And how many stores will be in this Fast Break that you can touch this year? And then I'll have a follow-up.
>
> [Stack:]
> Thanks, Adrienne. ***I can tell you that the team did across the globe, a great job to clean out the garage. There was a lot of excess inventory there, inventory that wasn't very productive***. Like we said in the Fast Break stores, we took out roughly 30% of the SKUs and kind of fixed that run-on sentence that was the Foot Locker

> shoe wall. The team across the globe, North America, Europe, Asia really got behind this whole clean out the garage objective and did that. ***And to be honest with you, we're -- that work is done. That's behind us. We cleaned out the garage with markdowns in the stores and move product through the Foot Locker stores and the Champs stores***. We also utilized -- and I think this is one of the benefits of the acquisition between DICK'S and Foot Locker.
>
> We actually utilized the DICK'S value chain of Going, Going, Gone to clean out a lot of that inventory. We were able to recover a higher cash amount by putting it through the DICK'S value chain than if we sent that out through a jobber. And it's – ***we're really well positioned. This inventory at Foot Locker is probably cleaner than it has ever been. And that's going to -- that should bode well for our margins and our sales going forward, returning this chain to growth with a comp of 1% to 3% should have margin expansion here. We're confident of that. So all in all, to clean out the garage, the team did a great job, and we're done***.

42. Gupta and Stack also boasted on the 3/12/26 Earnings Call about the Company's margins management success in what was a "very promotional" environment:

> [Gupta:]
> Yes, I'll just build on quickly. Like what ***the guidance that we provide always balances the optimism and the confidence that we have against the overall macroeconomic and geopolitical situation***. As you can see it, it's very dynamic. And so that was another thing that we factored into our guidance. Quickly touching on your gross margin expansion in Q4, we were very happy with the results we posted here. Like Lauren said, 3.1% comp on top of a 6.6% comp. ***In an environment -- in a quarter that is typically very promotional, we were very happy with the 67 basis points of margin expansion we posted here in Q4. And keep in mind, this 67 basis points of margin expansion all came from a merchandising margin. So our merchants and the inventory management team did a phenomenal job to finish the year strong from a clean inventory*** and driving top line momentum as well as gross margin expansion.
>
> [Stack:]
> And I think, [analyst] Simeon, also, it was more promotional out there than we had anticipated. And ***I think the team did a fabulous job managing our margin rates and the profitability of the business and the operating margins in an environment that was as promotional as it was***.

43. On April 8, 2026, Stack, Hobart and Gupta presented at the 2026 J.P. Morgan Retail Roundup Forum during which Stack had the following exchange with an analyst:

> [JP Morgan analyst:]

> As you think about staying on Foot Locker for a minute. . . now that the garage is cleaned out, right, you're not going to have the clearance pressures that Foot Locker experienced a year ago. To some degree, some of the promotionality is going to be a lot lower. So I'm trying to understand, shouldn't the merchandise margin rebound sort of at Foot Locker be sort of this accelerating curve as we start from the first quarter into the first half of next year?
>
> [Stack:]
> So we're not going to provide that guidance for you. But we do have kind of indicated that ***we expect that margin rate to get better***. And as of right now, that's kind of what we're going to -- we're not going to -- we're going to make sure we don't get out over our skis. But ***you will see margin rate expansion, which is part of what's taken us to grow this business again and to return it to profitability.*** But like I said, as we get a little bit further along and we can prove it, we'll give you more visibility to it.

44. On May 27, 2026, Dick's filed with the SEC on Form 8-K a press release titled "DICK'S Sporting Goods, Inc. Reports First Quarter Results. in which the Company repeated its ***$22.1 billion to 22.4 billion forecast for net sales*** and "raise[d] low end of full year 2026 guidance for comparable sales growth for both the DICK'S and Foot Locker Businesses . . . ***Foot Locker Business now 1.5% to 3.0%, up from 1.0% to 3.0% previously***."

45. Also on May 27, 2026, Dick's hosted an earnings conference call with analysts and investors to discuss the Company's first quarter 2026 financial results, during which Hobart had the following exchange with an analyst seeking "color on the promotional environment and maybe like how it impacts both the DICK'S and the Foot Locker side of the business":

> [Hobart:]
> Yes. In Q1, we didn't -- that ***wasn't a major factor. And we always, on both the DICK'S and the Foot Locker side, we'll manage through any promotional environment***.
>
> We do what's best for the consumer and best for our business, and we're very surgical about it. ***We've got advanced pricing capabilities where we can really be curated in how we lean into a promotional environment, but nothing on the horizon that we're particularly concerned about***.

### C. The Truth is Revealed to the Market

46. During pre-market hours on August 25, 2026, Dick's issued a press release titled "DICK'S Sporting Goods, Inc. Reports Second Quarter Results" ("8/25/26 Release") in which the Company reported adjusted earnings per share, operating income and Foot Locker's revenue were materially less than expected. Specifically, the 8/25/26 Release stated, in relevant part:

> 2026 Outlook Revised Due to Challenging Athletic Footwear and Apparel Marketplace
>
> - ***Reported earnings per diluted share of $3.50 and non-GAAP earnings per diluted share of $3.53 compared to earnings per diluted share of $4.71 and non-GAAP earnings per diluted share of $4.38 in the prior year quarter;*** Current year results include the dilutive impact of the 9.6 million shares issued in connection with the Foot Locker acquisition
>
> - DICK'S Business delivered 4.9% comp sales growth, driven by broad-based growth across categories, including strong results from the 2026 FIFA World Cup, and growth in average ticket and transactions
>
> - ***Proforma comps for the Foot Locker Business declined 3.6%, impacted by challenging conditions in the athletic footwear marketplace***
>
> - ***Revises full year 2026 outlook***
>
>   - Maintains DICK'S Business comparable sales outlook of 2.5% to 4.0% growth
>
>   - ***Lowers Foot Locker Business proforma comparable sales outlook to a range of negative 2.0% to 0.0%***
>
>   - ***Lowers operating income outlook for both DICK'S and Foot Locker Businesses***

47. The 8/25/26 Release further revealed that Dick's also had reduced its full-year 2026 consolidated net sales guidance to $21.9 billion to $22.2 billion (down from $22.1 billion to $22.4 billion) and that the Company expected Foot Locker's proforma comparable sales to yield a range of negative 2.0% to 0.0%, significantly down from its forecasted 1% to 3% growth.

48. Commenting on the disappointing results, Stack admitted in the 8/25/26 Release:

> The DICK'S Business delivered a strong second quarter with broad-based growth across categories. ***As the quarter progressed, conditions across portions of the athletic footwear and apparel marketplace became increasingly promotional, and we took action to remain competitively priced to protect and grow our leadership position. This environment had a more significant impact on the Foot Locker Business given its greater exposure to legacy footwear silhouettes and greater dependence on footwear launch and retro product. Not only were there fewer launches in the second quarter, but those launches performed below both industry and our expectations***. As a result, we are taking a more cautious view of the balance of the year. While these near-term dynamics have led us to revise our expectations for 2026, our confidence in the long-term opportunities ahead for both DICK'S and Foot Locker remains unchanged.

49. Also on August 25, 2026, Dick's hosted an earnings conference call with analysts and investors to discuss the Company's financial results for the quarter, including the unexpected negative news concerning Foot Locker and its effect on revenue and forecasts ("8/25/26 Earnings Call"). During the 8/25/26 Earnings Call, Stack expanded on the causes of the Company's disappointing results, stating:

> ***as the quarter progressed, it became clear that inventory levels were building up across parts of the industry, leading to a much more promotional environment. This pressured our overall company earnings***. Consumer preferences are evolving with athletes increasingly responding to newness, innovation and a broader set of brands. ***As demand continued to shift during the quarter, inventory built up in parts of the industry, particularly within certain legacy footwear silhouettes and apparel franchises that simply aren't resonating the way they once did***.
>
> ***The inventory built up across the industry supply chains and across the retail marketplace, which led to an increasingly aggressive promotional environment***. In response to these changes in the market, we felt it was important to remain competitively priced to protect our leadership position. We have always managed our business for the long term. We believe protecting our leadership position will create long-term value, and we view the pricing investments we're making today as an investment in the future strength of our business.
>
> ***These challenges affected both DICK'S and Foot Locker***, but to different degrees. At DICK'S, our diversified business model, broad category mix and balanced brand portfolio helped us navigate much of this pressure. Many areas of the DICK'S business, such as team sports and licensed were particularly strong. New emerging apparel brands generated strong athlete engagement and footwear categories such as running, cleats and the outdoor category remained healthy. While the

> ***promotional environment created pressures on margins***, we continue to gain share and deliver strong sales growth.
>
> As you would expect, given its greater exposure to many of the legacy footwear silhouettes, the impact was more significant at Foot Locker. In addition, Foot Locker is more dependent on launch and retro product. ***Not only were there fewer launches in the second quarter, but the launches we did see performed below industry and our expectations. This had a meaningful impact on the results across the Foot Locker business***. We're taking action to shift the mix toward in-demand brands. And while we expect the launch calendar to be more favorable in the back half of the year, the quality of those launches will be critical. We expect the broader promotional environment, particularly around legacy silhouettes to remain challenging at least through the fourth quarter.
>
> ***In addition, the Foot Locker business in EMEA [Europe, the Middle East and Africa] has been more challenging than expected***. While our turnaround efforts are underway, we always anticipated EMEA to have a longer path to recovery than North America. ***The promotional environment remains very aggressive in EMEA. The industry is carrying too much inventory and the consumer has been even more cautious than expected due to the geopolitical environment. The combination of the softness in EMEA and these marketplace dynamics has delayed the pace of improvement that we expected to see in the Foot Locker business***.

50. Analysts' collective dismay concerning the disappointing news was obvious during the 8/25/26 Earnings Call. For example, a Morgan Stanley equity analyst immediately asked "what's changed since we were sitting here 90 days ago and you were raising guidance and speaking very optimistically about both DICK'S and Foot Locker?" In response, Stack blamed the previously minimized effects of the promotional footwear market, stating:

> Thanks for the call, Simeon, and thanks for being so direct. First of all, we continue to be very excited about our business, and I think everybody should know that. The DICK'S stores comped 4.9%, and we did not take the sales down. Our sales expectations down on the DICK'S side. ***We are expecting margin pressure as the market has become much more promotional, primarily in the athletic footwear space***. But the DICK'S business continues to perform extremely well. ***A number of brands got very -- what changed is a number of brands got very promotional on their sites and those promotions spilled into the broader marketplace. And we expect that to unfortunately continue through the balance of the year***.
>
> But on the DICK'S side, we've got a very broad category portfolio, and DICK'S is not nearly as reliant on the footwear business as Foot Locker is. ***We've taken the***

> ***EPS down in DICK'S a little bit because of the margin pressure, the macro geopolitical environment***. But overall, the DICK'S business has been very good. Comps at 4.9% in the quarter, and we did not take -- we did not reduce our expectations from a sales standpoint. ***We did participate and expect to participate in this promotional environment, and we really believe that that's one of the best investments we can make in this business is to keep that leadership position and not give that market share because this is going to subside at some point, and we'll keep that market share when things start to get better. But we think the promotional environment out there, we need to participate in that, and it's one of the best investments we can make in our business***.
>
> From a Foot Locker standpoint, we still continue to be really excited about the long-term opportunities for Foot Locker. As several of these brands became more promotional to clear inventory, the margin pressure on Foot Locker is much greater than DICK'S. As we all know, footwear is the vast majority of the Foot Locker business. And ***Foot Locker is much more reliant on those legacy silhouettes that have slowed down. They're much more reliant on launch product and the launch product in Q2 was -- it was disappointing in the marketplace***, not just for us, but for the entire marketplace.
>
> ***And the another thing from a Foot Locker standpoint that we didn't realize would continue to be as difficult as it is, is EMEA. The impact on EMEA is much greater than what's going on in the U.S. It's a more competitive market. It's a much more promotional market than the U.S.*** right now based on fuel costs, the consumer is much more cautious in EMEA. The excess inventory that's out there really contributed to this real margin pressure. You've seen that from some other retailers in Europe that have talked about how promotional the market is and how difficult the consumer is. . .

51. On this news, the price of Dick's common stock dropped by approximately 30%, or $55.02 per share, from 179.33 at close on August 24 to $124.31 per share at close on August 25, 2026.

52. Analyst reaction was just as fast and severe. Wells Fargo & Company immediately lowered its price target from $240.00 to $185.00 and set an "overweight" rating for Company's stock. JPMorgan Chase & Co. reduced its target price for Dick's stock from $270.00 to $245.00 and also gave Dick's stock an "overweight" rating. DA Davidson dropped their target price on Dick's stock from $260.00 to $205.00. Zacks Research reduced Dick's stock from "hold" rating to a "strong sell." Robert W. Baird & Co. also reduced its estimates and price target, noting that

the Company's "miss and guide-down magnitude surprised us" while openly questioning management's credibility.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

53. Plaintiff brings this action derivatively in the right and for the benefit of Dick's to redress Individual Defendants' breaches of fiduciary duty and other violations of law.

54. Plaintiff will adequately and fairly represent the interests of Dick's and its shareholders in enforcing and prosecuting its rights.

55. The Board currently consists of the following eleven directors: Defendants Stack, Barrenechea, Chirico, Colombo, Eddy, Fink, Fitzgerald, Hobart, Mathrani, Ralls-Morrison and Schorr.

56. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act.

57. The Individual Defendants face a substantial likelihood of liability for, among other things, approving or otherwise not preventing the Company's issuance of its financial and related statements that, among other things, failed to disclose that Foot Locker remained encumbered by unproductive inventory notwithstanding the Company's purported aggressive cleanup efforts; (2) Foot Locker largely derived its revenue from legacy footwear products which were subject to an increasingly aggressive promotional environment; (3) which exposed Dick's to inventory build ups across industry supply chains and the retail marketplace; and (4) as a result, the Company was unable to achieve the financial targets it announced and promoted to investors.

58. During various times of the Relevant Period, pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were and are responsible for, among other things, reviewing the Company's annual and quarterly financial reports and reviewing the integrity

of the Company's internal controls. The Audit Committee Defendants breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures and failed to recognize or correct the Company's internal control failures. Therefore, the Audit Committee Defendants each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

59. Moreover, the Audit Committee Defendants failed to maintain the level of oversight required, including that the requirements that the Audit Committee discuss with management and review with the Board, the legal and regulatory requirements applicable to the Company and its subsidiaries and the Company's compliance with such requirements and as appropriate, make recommendations to the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations.

60. The principal professional occupation of Stack and Hobart are their employment with Dick's, pursuant to which they have received, and continue to receive, substantial monetary compensation and other benefits. The Board agrees. The Company's May 1, 2026 Proxy Statement admits that Stack and Hobart are not independent.

**COUNT I**

**Against Individual Defendants for Breach of Fiduciary Duties**

61. Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein.

62. As alleged in detail herein, each of the Individual Defendants violated and breached their fiduciary duties of loyalty and good faith by causing or allowing the Company to disseminate to Dick's shareholders materially misleading and inaccurate information through, *inter alia*, SEC

filings, press releases, conference calls and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

63. Also as alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

64. Individual Defendants, most notably those serving on the Board's Audit Committee, willfully ignored the known and pervasive problems with The Company's internal controls and practices and procedures and failed to make a good faith effort to correct these problems or prevent their recurrence.

65. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages. Thus, as a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**COUNT II**

**Against Individual Defendants for Unjust Enrichment**

66. Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein.

67. By their wrongful acts and omissions, Individual Defendants were unjustly enriched at the expense of and to the detriment of Dick's.

68. Plaintiff, as a shareholder and representative of Dick's, seeks restitution from Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits,

benefits, and other compensation obtained by Individual Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

**PRAYER FOR RELIEF**

69. WHEREFORE, Plaintiff demands judgment as follows:

a. Declaring that Plaintiff may maintain this derivative action on behalf of Dick's and that Plaintiff is a proper and adequate representative of the Company;

b. Against Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Individual Defendants' breaches of fiduciary duties;

c. Directing Dick's to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable law and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's by-laws or articles of incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

d. Awarding to Dick's restitution from Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Individual Defendants;

e. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

f. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

70. Plaintiff demands a trial by jury.

Dated October 5, 2026

Respectfully submitted,

**THE WEISER LAW FIRM, P.C.**

*s/ James M. Ficaro*
JAMES M. FICARO (PA Bar No. 308198)
jficaro@weiserlawfirm.com
JOHN J. GROSS (PA Bar No. 91687)
jgross@weiserlawfirm.com
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
West Conshohocken, PA 19428
Telephone: (610) 225-2677

**DICK'S SPORTING GOODS, INC. VERIFICATION**

I, Michael Lewis, hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Complaint, and that I have authorized the filing of the Verified Shareholder Derivative Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 10/01/2026

Michael Lewis
Michael Lewis (Oct 1, 2026 10:27:25 EDT)

Michael Lewis